All right, we'll call our last case for the morning, and case number 24-1865, 1866, 1867, and 1868. And I believe we have Mr. Kastanek as well as Mr. DeJulius. All right, and so you will approach the elector and you go right ahead. If you'll give us just one moment. You may proceed. Thank you, and may it please the court. The district court erred in excluding the expert meta-analysis and general causation opinions of Dr. Martin-Wells. Pervading the district court's opinion was its view that Dr. Wells cherry-picked the studies for his analysis. She repeatedly accused Dr. Wells of transparently reverse-engineering his analysis, and that accusation rests on core misunderstandings, both factual and legal. It rests on her misunderstanding of what part of the analysis must be objectively replicable. It rests on her misunderstanding of the role of the first expert report versus explanations that come later in time. It rests on her ticky-tack criticisms of Dr. Wells that veer into what this court in manpower called the third level, kind of like the third rail of the L train. It rests on her flat disregard of Dr. Wells' sensitivity analyses, he ran six of them, which the district court did not at all engage in quite inexplicably. And at the Bradford Hill stage, it rests on her complete misunderstanding of what a null result is. If the court will allow, I will start with the court's legal error in requiring objective replicability at the wrong stage of the meta-analysis. Meta-analysis has three parts, as you know. First, identification of the potentially relevant studies. That stage is not at issue here. Everyone agrees, including the defense, that Dr. Wells identified the complete universe of 36 studies that were relevant to his analysis. They don't identify a single study that he missed at that stage. The second step is selection of the studies, then, for the meta-analysis, and let me come back to that stage. The third step is the math to calculate in odds ratio. Step three, the math, is what must be objectively replicable. So Borenstein says this very clearly, the statistical synthesis of the math must be transparent and objective. So in other words, the math must math. But the defense doesn't say here that the math in question that Dr. Wells used doesn't math. It all adds up. So let's step back to step two, which is the selection of the studies that's primarily in dispute in this appeal. It makes no sense to evaluate that evaluating studies for quality must be objectively replicable. Studies selection involves the exercise of scientific judgment. A meta-analysis involves picking the best quality studies. And judgments across biostatisticians that differ as to study quality, that's an everyday occurrence in this field. Dr. Wells here started off with seven meta-analyses. Six of them were published and peer-reviewed, and their reliability can hardly be questioned. The seventh was the meta-analysis that was conducted by the EPA, the systematic analysis. Every single one of those meta-analyses included different studies. This is very important. None of them included all of the same studies. Some included Lew, some excluded him. Some included van der Mark, some excluded them. And Dr. Wells' scientific method here... Let me just make sure I have clarity on the point in regards to the methodology. So we have a qualitative and you have a quantitative portion of the meta-analysis. What I've characterized in my head is the rubric. The suggestion is that the rubric itself, does that have to be objectively reliable? Of course. Of course it needs to be objectively reliable. What I understood the district court to say is that it must be replicable. And that's not a term that is easily transported to the quality determinations that are made with respect to studies. Let me take one step back and just talk about... I'm sorry, Judge. Go ahead. Didn't the district court also say that the omission of literature called into question whether a methodology was being followed at all? Yes. Yes, Your Honor. And that's such a good point because it is what meta-analysis is. So on page 36 of her opinion, when she starts looking at the meta-analysis, there's a quote there that I just want Your Honors to focus on because she says, Dr. Wells, by conducting this meta-analysis, omitted a significant amount of epidemiological literature. Yes, he did. That's a meta-analysis. Everybody agrees it involves picking studies that meet criteria. And to Judge Pryor's question, I was going to walk through what those picking steps were from him because I think it makes the issues here very clear. So there were three steps. Is there an explanation from... Because the testimony fluctuated in a sense. I don't accept that as what happened here, but from 36 to 11 to 7. To 8 to 7, Your Honor. 8 to 7. And so I'm trying to follow along with the opinion, page 36 in particular, as to is there an explanation using the rubric, using the methodology that Dr. Wells laid out? Is there an explanation in the record for the 36 to 11 using that methodology? Yes. I would point, Your Honor, to the clearest explanation being in his rebuttal report. And let me walk through what he says there, and then we can draw it back to his earlier report if that's something Your Honor is concerned about. So a few steps. He starts with the seven meta-analyses that I mentioned. Those are the meta-analyses that were done by biostatisticians that came before him in the field. He compiles this universe of 36 studies that, again, as I said, defense doesn't allege that there's anything missing from those 36 studies. Their expert created a list of 32, so their expert's list was even more exclusive than Dr. Wells'. Dr. Wells then applies a two-step process to get to the eight and then to the seven. The first step is to say, I am going to consider exclusion, exclusion, inclusion criteria. He says this on the very first page of his very first report. I am looking at epidemiological studies that were case-control in design, that looked at Paraquat and Parkinson's in an occupational setting. So that's four of the criteria, case-control, Parkinson's, Paraquat. Those are kind of obvious ones. Occupational, and then the fifth one that he explains later on in the report is that they have to have sufficient data, also kind of an obvious one because he's conducting a meta-analysis. Of course there needs to be sufficient data. That took him down to eight studies, so that excludes SRIFA. So from the first report to the second rebuttal report, is he getting rid of the number 11? Yes. He gets down to eight by just applying those five criteria I just said. I guess my question more directly pointed was, is there explanation from the record to explain the first report where he was at 11? I think that he's asked about that in the deposition, and he explains that I got down to eight, and this is very clear in the rebuttal report, Your Honor. He says SRIFA, POSU, those are cohort studies, and my epidemiological approach, which is a scientific debate in the field, is to not combine cohort and case-control studies. And so he doesn't consider SRIFA and POSU and other cohort studies to qualify for his analysis. Now at that point, he evaluates quality, and he omits only a single study for his meta-analysis, which is Vandermark. And he does so because Vandermark fails all of his quality criteria. And this is one thing that I really want to emphasize in this argument to make sure everybody understands, is his sensitivity analysis that he conducts, the district court doesn't even mention, I went through the entire 97-page opinion yesterday to look for this, is that he conducts an analysis that takes his seven studies, the one he thinks is greatest quality, he adds Vandermark in, and he comes up with an odds ratio of over 2.0. This is, I can give you a record cite for it if you want one, that sensitivity analysis is at docket 4561-14, which is exhibit 13 to the plaintiff's Dauber briefing. As your honors know from the briefing, this appeal comes down in large part to the quality determinations as to Vandermark. So the district court thought that that was cherry-picked, the defense claims that that's cherry-picked. That sensitivity analysis is Dr. Wells saying, look, I think I'm right about quality here, but I'm going to go the next step and do this sensitivity approach where I show you that that decision didn't drive outcome. So sensitivity analysis is taking the methodology, making changes to it to test whether methodological choices drive outcome. His sensitivity analyses showed that it didn't. The same is true of the sensitivity analysis that he did for the EPA study. So figure three in his initial report takes the EPA's high and medium quality studies, and it does a meta-analysis on them, and it also finds an OR above 2.0. Again, the district court didn't address this, didn't grapple with it at all. She instead seems to misunderstand. But shouldn't she not have addressed the conclusion and more so focused on whether or not the methodology that Dr. Wells articulated was reasonably applied? Yes, she should have, but the point is, I mean, you're right. His methodology needs to be reliable. But what he's saying is, look, I'm testing this in various ways to show that the defense's criticism of his methodology is outcome-driven, which is the primary methodological issue here. Is it outcome-driven or not? I'm doing this as this extra step, abundance of caution, to show you that this isn't outcome-driven. My methodology is reliable. I'm following standard procedures in the field. And the defense expert, going back to Your Honor's question about whether this was appropriately disclosed and if the defense knew enough about it to be able to rebut and refute, the defense expert, Dr. Alexander, took Dr. Wells' analysis, knew enough about it, the studies excluded, included, the data he used, to be able to replicate it. And this is another thing that the district court misunderstood. So in footnote 46 of her opinion, she seems to treat the argument about Dr. Alexander as, well, their expert is unreliable, so it's okay if Dr. Wells' expert opinion is unreliable. No, no, that is not the import of this. It shows that his analysis was transparent enough that another expert was able to come in, do the meta-analysis, and what Dr. Alexander did is he swapped Shretha for Tanner, so quality determinations as to whether Shretha or Tanner, which used the same population, were more reliable. They swapped it, created an odds ratio below 2, 2.0, and it just demonstrates that all of this was sufficiently transparent to be able to push the boundaries and to be able to refute and respond. This is a classic case of dueling experts that should have gone to the jury. If I may, I will address the Bradford Hill criteria very briefly, which is a final error of the district court. The district court imposed a weighting requirement for the Bradford Hill criteria that isn't traceable to any requirements in the law or the scientific literature. So as the First Circuit explained in Millward, no algorithm exists for Bradford Hill criteria. It's not conducive to ranking, and statisticians and epidemiologists agree. So Weed, another epidemiologist in the field, describes ranking as a matter of personal preference. The restatement says the same. Vacari and Brekkeridge, which are peer-reviewed published studies, didn't engage in ranking. We cite testimony from another expert in the field, I think in our reply brief, where he was asked about ranking the Bradford Hill criteria, and he says, I don't know of any epidemiologist who does that as a matter of practice. And it's yet again kind of another example of the district court getting over her skis and imposing bright-line requirements that don't have a foundation in the industry and the field of epidemiology, just like requiring him to state in advance every bit of his analysis, even though Rule 26 doesn't require him to do so, and even though Rule 702 isn't keyed to any specific report by the expert. So if there are no further questions at this point, I'd like to reserve the remainder for rebuttal. Thank you, counsel. All right. Mr. DeGiulis. Good morning, Your Honor. Good morning. May it please the Court. Lee DeGiulis of Jones Day on behalf of the appellees. I'd like to start first with the Amedda analysis, and the question here is whether the district court abused its discretion in determining that plaintiffs had failed to meet their burden to prove that Dr. Wells applied a reliable methodology. And there's three principal reasons why the court should be affirmed. First, Dr. Wells applied a holistic methodology. We had a report. We had a deposition. And plaintiffs do not contend that a subjective, holistic methodology is reliable under Rule 702. They start at the second report, the rebuttal report, and I'll get to that. But they never contend that the holistic methodology was reliable. Second, Dr. Wells midstream, after he reached his conclusions, changed his methodology. He took away the holistic methodology. He repeated holistic more than 12 times in the deposition. If you go to Essay 130 to 134, it's about 20 pages of testimony where he talks about the totality of circumstances, looking at all of the factors. He refused to provide any specific criteria. Then in the rebuttal report, he comes through with a five-inclusion factor, five-quality factor test that is nowhere to be found, that is irreconcilable with his holistic methodology. And you cannot contain, you cannot change midstream after reaching conclusions. There's no argument by plaintiffs that it is scientifically valid, that it is a reliable methodology to come forward with conclusions and then decide your methodology. That's sentence first, verdict later. It's not allowable under the scientific method. And the third reason, Your Honor, is that Dr. Wells unreliably and inconsistently applied that two-factor methodology. So in order to make his analysis work and to come back and meet those conclusions that he had already said in his first report and that he expounded on his deposition, he had to fudge the numbers. He admitted at his first deposition that Lew wasn't an occupational study, as he said it was required in his first report. He had to change and monkey with the participation rates. He first said in his deposition there is no required participation rate. In his rebuttal analysis, he said 60% is required. He had to change the diagnostic criteria to get Vandermark out and Lew in. That is not a valid scientific method. Looking at the Lew test, was there any participation rates reported at all? For Lew? Uh-huh. No, Your Honor. Lew did not have a participation rate. Dr. Wells said he assumed it was 100% because the people who started finished. But under that theory or that analysis or definition, Vandermark would also have 100% participation. They looked at apples to oranges. And Tanner, if you recall, did not have a participation rate either. It just said participation was good. But Dr. Wells didn't provide any knocks on those two studies. And so I think it's very important when you go back and you look at what's that issue here. Is there any support for the notion that the subjectiveness of meta-analysis is kind of baked into the science? It's understood that the expert is permitted to use this methodology that is identified to somewhat consolidate studies from different areas. And so I'm concerned, looking in particularly 59 through 63 of the district court's opinion, did we merge into credibility in the sense that we're requiring? And so I'm just trying to get clarity as to your understanding of the science, of what part of subjectivity is permitted when employing a meta-analysis. Absolutely, Your Honor. The first part of the meta-analysis has scientific judgment in it. The expert has to identify criteria upon which he will search the literature, upon which he will apply exclusion criteria in order to get down to the studies to include in the meta-analysis. That is absolutely correct. And there's a great deal of scientific judgment that goes into that. And the district court was very clear. She's not criticizing Dr. Wells for including Tanner or Lew and excluding Shrestha or Vandermark. It is the methodology by which he went about that analysis. And there is no scientific evidence. Plaintiffs have not offered any evidence that a holistic, subjective methodology counts under the scientific method, that that is somehow scientifically valid. What Cochran says, and you remember, Dr. Wells on Essay 129 says I'm following Cochran. Cochran says you have pre-specified written criteria upon which you will examine your studies. But he provides that criteria in the rebuttal report. Absolutely, Your Honor, but that rebuttal report is irreconcilable with his initial methodology, which is holistic. Look at pages Essay 130 to 134. He repeatedly, over and over again, says there is no specific criteria. But aren't we now questioning the credibility as to whether or not his first representation, that it was holistic, was somewhat of, wasn't true because now you're coming back in reverse engineering and coming up with these factors, qualitative and quantitative, after the fact. So whether or not holistic was the wording was used, and Dr. Wells comes back and says it was holistic based on these factors. No, Your Honor. So are we questioning the credibility? No, Your Honor. Allow me to finish so we can make the record. When we speak over each other, it gets jumbled. I understand. And so I'm questioning whether or not we're kind of going, stretching beyond what manpower allows when we're doing this. And I see it here in the order. Well, Your Honor, I think the clearest example, and you touched upon it, of why this is not a credibility determination, it's really taking Dr. Wells at his word. If you look at the first report, he has 111 materials upon which he considers. He then goes to 11 studies and determines from those 11, 7 studies will be part of his meta-analysis. That is his first report. That's his deposition. And those numbers are irrebuttable, 111, 11, and 7. His second report, his new analysis, his new methodology, he says, I start with 36 studies. He can't recall how he got to those 36 studies, but he goes from 36 to 8 and then to 7. Those are three different data sets. The numbers don't lie. He applied a different analysis in the rebuttal report. And so when he's talking about holistic, and the judge does a nice job, Judge Rosenstein, on pages 39 and 40 of her order of going through the times that Dr. Wells talks about holistic, it is not about a mechanical two-step analysis that someone can follow. It is simply, I look at all the factors in the study and I decide whether it's good or not. He at one point says, well, I don't have a algorithm, but I guess if I had an epidemiologist in a room, we could talk about it and probably come to the same sort of conclusions. That's exactly what this court in Zenith said is impermissible. It can't simply be expert, I say so. There has to be some sort of methodology. Was she attacking the factors that he considered, the five factors that he considered, or was she attacking how he applied those factors? Judge Rosenstein said that his methodology itself was unreliable. Whatever the outcome came to, it was unreliable because he started with one methodology, he changed methodology, and then he inconsistently applied that methodology. And that is perfectly consistent and fits right in with manpower. The court mentioned manpower earlier. Wouldn't you have to overturn manpower? Absolutely not, Your Honor. Absolutely not. Manpower says on page 808 of its opinion, the data selection is inseparable from the methodology. I'm sorry, that the methodology and the data selection are separate. They're wholly different. You beat me to it. I know, Your Honor. Thank you. Thank you. I appreciate you would have corrected me. In this case, there is no separation. The methodology is the data selection. Counsel stood up and she said there's three parts of a meta-analysis, identification of the study. Dr. Wells said he didn't know how he got there, and if you go to A58, there's that quotation there. She said the selection of the study, the meta-analysis that we're talking about, and then she said the objective portion, the math at the end. Well, I want to point the court to Essay 408 where Dr. Wells says he doesn't actually do the math. That's not something he does. He does the meta-analysis. And so when you talk about how Dr. Alexander could replicate the work that Dr. Wells did, it's because it simply is a math. It's literally a computer program that is plugged into confidence intervals and participant studies, members, et cetera, a certain data pool, and it prints out the numbers. Both experts use the same computer program. That's not what this is about. It's about the methodology in selecting those studies, in determining what goes into the meta-analysis, and that, unlike manpower, is not separable. It is one and the same. The methodology is the same. Unless there's questions on the meta-analysis, I'd like to turn to Bradford Hill. On Bradford Hill, Your Honor, the courts have recognized repeatedly that Bradford Hill is inherently a squishy type of analysis. It basically requires experts to look at nine different factors, determine, based on those factors, whether or not causation exists. What the courts have repeatedly done, including Millward, which counsel cited this morning, is require an explanation as to why those factors are met. If you look at Dr. Wells' initial report, Essay 20-24, the entirety of his Bradford Hill analysis, he only touches upon one side of the issue. What the Bradford Hill requires is a totality of the evidence review. A totality of the evidence review. That means you have to look at the positive and you have to look at the negative. And what Dr. Wells does is he just looks at the studies that support him. When you look at dose response, he looks at Tanner, he looks at Lew, he cites a study called Furlong. He doesn't ever address Shrestha. He doesn't ever address Vandermark, which find an inverse dose response. That is to say that the more Paraquat-1 uses, the less likely one is going to have Parkinson's disease. That is a significant issue. He ignores it. He doesn't address it. When you look at strength of association, he looks solely at his meta-analysis. There's seven studies in his meta-analysis. Five find there's no association, significant association, between Paraquat and Parkinson's disease. He says, I just look at the meta-analysis. I don't have to look at anything else. He doesn't look at Shrestha. He doesn't look at Vandermark. He doesn't look at Boucher. He only looks at one side of the issue. So in order to have a valid totality of the evidence review, he's required to go back, and he's required to look at all of the evidence and apply that evidence in a reasoned way. He never did that here. District Court tried to look at both reports, tried to examine and give him the benefit of the doubt that I'll look at what you've done here. There isn't an explanation as to why those factors, if you looked at both sides, come out the way they do. Your Honor, if there's no further questions, I'm OK. Thank you. This court should affirm the court's abuse or its use of discretion in this case. Thank you, Your Honor. Thank you. Briefly, Your Honor, let me start with Bradford Hill and this idea that he only picked positive studies. It's factually incorrect. It misinterprets what Dr. Wells meant by null. Null means it cancels each other out. He didn't disregard negative studies. What he disregarded or what he chose not to consider, consistent with scientific literature, were results where the confidence interval spanned 1.0. So below 1.0, there is an adverse relationship between Paraquat and Parkinson's, meaning being exposed to Paraquat would somehow have a protective effect. Over 1.0, it's the opposite. What Dr. Wells said was where the studies interval, confidence interval, spans both. That is not telling me anything. So think about it like a political poll. In the days leading up to an election, you have a poll that shows that a candidate is up by two points, but it has a margin of error of five. So if you apply that margin of error on one side, he or she is losing. On the other side, he or she is winning, and there's also an option in the middle. That is what Dr. Wells is saying about the null results, that those don't tell me anything because they could be negative, they could be neutral, they could be positive. And the district court, once again, misunderstood that. Judge Pryor, I think on the meta-analysis you're exactly right. The district court stretched manpower beyond its proper role here, or 702 beyond its proper role. The defense says, complains, that Dr. Wells from the beginning said his approach was holistic. It was as to the quality factors, and holistic doesn't mean subjective. It means that as to the quality factors, not a single one was dispositive. At the inclusion-exclusion criteria, which is what led him to those eight studies, it wasn't subjective, it wasn't holistic. He didn't include studies unless they were case control, evaluated Parkinson's and Paraquat, had sufficient data, and were occupational in nature. There wasn't lethal inconsistency in his positions with respect to that. If I can take one moment and address occupational, it is very important to keep in mind that as to occupational, he used an OR from Lew that was specific to use of Paraquat. Occupational meaning related to activity. The district court misunderstood occupational as workplace-related, rather than a broader definition, think occupational therapy as related to activity, as distinguished from community exposure. And when you understand occupational in that way, you will see that there's not lethal inconsistency with respect to how he approached these various factors. Thank you. If there are no questions from the panel, we would ask that you reverse. Thank you, and thank you to both counsel. Those are all our arguments for this morning. The court will take the case under advisement. The court is in recess.